1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3

4   UNITED STATES OF AMERICA      .    4:10-CR-203-1

5   VERSUS                        .    HOUSTON, TEXAS

6   AGHAEGBUNA ODELUGO            .    JANUARY 30, 2012

7   . . . . . . . . . . . . . .    9:30 A.M.

8                    TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE VANESSA D. GILMORE
9                 UNITED STATES DISTRICT JUDGE

10                        *APPEARANCES*

11

    FOR THE GOVERNMENT:
12

         Albert A. Balboni
13       Katherine Haden
         Assistant United States Attorney
14       1000 Louisiana
         Suite 2300
15       Houston, Texas  77002

16  FOR THE DEFENDANT:

17       Erik R. Sunde
         Attorney at Law
18       402 Main Street
         Suite Three South
19       Houston, Texas  77002

20

    OFFICIAL COURT REPORTER:
21

         Mayra Malone, CSR, RMR, CRR
22       U.S. Courthouse
         515 Rusk, Room 8004
23       Houston, Texas  77002

24  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.
25

```
09:55    1              P R O C E E D I N G S
         2         THE COURT:  United States of America versus Aghaegbuna
         3  Odelugo.
         4              For the United States?
09:55    5         MR. BALBONI:  Al Balboni for the United States.
         6         THE COURT:  And for Mr. Odelugo?
         7         MR. SUNDE:  Erik Sunde, Your Honor.  Good morning.
         8  Your Honor, I'm going to request that we seal the courtroom
         9  because of the nature of certain things that we need to bring
09:55   10  to the Court's attention regarding ongoing matters.
        11         THE COURT:  Regarding what?
        12         MR. SUNDE:  Ongoing cooperation.
        13         THE COURT:  I thought we already got a motion filed,
        14  didn't we?
09:56   15         MR. SUNDE:  There is one, but there is additional --
        16         MR. BALBONI:  I'm hearing about the additional
        17  cooperation for the first time.
        18         MR. SUNDE:  It is mentioned in our sentencing
        19  memorandum, Your Honor.
09:56   20         THE COURT:  How about I just read the sentencing
        21  memorandum and leave it at that?
        22              Okay.  We are here for sentencing.
        23              Mr. Balboni, has the United States seen the
        24  presentence investigation report and the addendum to that
09:56   25  report?
```

3

09:56    1        *MR. BALBONI:*  Yes, Your Honor.

         2        *THE COURT:*  Mr. Sunde, have you and your client seen

         3   the presentence investigation report and the addendum?

         4        *MR. SUNDE:*  We have, Your Honor.

09:56    5        *THE COURT:*  All right.  Then the presentence

         6   investigation report and the addendum will be placed into the

         7   record under seal.  In the event that there is any appeal of

         8   this case, the only portion that will not be disclosed will be

         9   that portion that contains a sentencing recommendation from the

09:56   10   probation department to the Court.

        11             There were no objections by the United States; is

        12   that correct?

        13        *MR. BALBONI:*  That's correct, Your Honor.

        14        *THE COURT:*  Let me deal with the objections that have

09:56   15   been filed by the defendant.  Something is odd, though,

        16   Mr. Sunde.

        17        *MR. SUNDE:*  I understand the paragraphs were off.

        18   Judge, I have no earthly idea why that is.

        19        *THE COURT:*  They weren't just like a little bit off,

09:57   20   they were just like way, way, way off.

        21        *MR. SUNDE:*  Ms. York brought that to my attention this

        22   morning for the first time, and I apologize.  I don't know why

        23   they are off.

        24        *THE COURT:*  I'm sorry, Lawyers.  There is also a

09:57   25   second addendum.

09:57   1                    Mr. Balboni, did you see that?

        2              *MR. BALBONI:*  I believe so, Your Honor.  Yes, Your

        3    Honor.

        4              *THE COURT:*  Did you get a chance to see the

09:57   5    information?  It was just information that you had actually

        6    provided, Mr. Sunde.

        7              *MR. SUNDE:*  Yes, Your Honor.

        8              *THE COURT:*  All right.  Let me deal with the

        9    objections.  It looks like you guys were looking at a different

09:57  10    presentence investigation report.

       11              The defendant first objects to paragraph 28.  In

       12    reality, it should have been paragraph number 69 of the report.

       13    That is the paragraph that gives the base offense level based

       14    on the loss amount.  The objection is that the United States

09:58  15    agreed that they would make the loss amount no more than

       16    $20 million.  Okay.  That is per the United States agreement.

       17    The Court is not bound by that.

       18              *MR. SUNDE:*  That's correct, Your Honor.  The Court is

       19    not bound by it.

09:58  20              *THE COURT:*  The objection is overruled.  The defendant

       21    next objects to paragraph 59 -- it should have really been

       22    paragraph 71 of the report -- that assessed the defendant a

       23    two-point adjustment for sophisticated means.  I think the

       24    sophisticated means application applies in this case.  I don't

09:59  25    always put it in all Medicare/Medicaid fraud cases, but in this

09:59    1    particular instance, I think it is appropriate and applicable.

2    The objection is overruled.

3            The defendant next objects to paragraph 61.  It

4    should be 73 actually because it is the paragraph that deals

09:59    5    with the organizer/leader role.  I think that this is a case

6    where the application of the organizer/leader role is

7    appropriate based on the facts of this particular case.  The

8    objection is overruled.

9            The defendant objects to the information in --

10:00   10    let's see what paragraph this is going to be.  I think it is

11    going to be information -- yeah, it lists 73 and 74, but it is

12    actually 85 and 86, maybe 84.  Defendant objects to, I guess,

13    the inclusion of this information in the report.  There are

14    other arrests and other pending charges that are duplicative of

10:00   15    the charges that are pending in this case.  I think it is

16    provided just for the Court's information and doesn't have any

17    impact on sentencing.  The objection is overruled.

18            The defendant asked for acceptance of

19    responsibility and that must have been from the original report

10:01   20    that did not give him acceptance because the report that the

21    Court has does give the defendant acceptance of responsibility,

22    so that issue is moot.

23            Were there any other factual inaccuracies in the

24    report, Mr. Sunde?

10:01   25            MR. SUNDE:  No, Your Honor, not to our knowledge.

Mayra Malone, CSR, RMR, CRR
mayramalone@comcast.net

10:01  1     THE COURT:  Okay.  Did you see anything, Mr. Balboni?

2     MR. BALBONI:  No, Your Honor.

3     THE COURT:  All right.  Then the Court adopts the

4     presentence investigation report and the addendum, finds that

10:01  5     the statutory range of punishment on Count 1 is not more than

6     five years, on Count 2 is not more than 10 years, on Count 3 is

7     not more than 20 years.

8              The supervised release term on Counts 1, 2 and 3

9     is not more than three years.  The fine range on Counts 1, 2

10:02  10    and 3 is 250,000 each, for a total of 750,000.  Restitution,

11    $9,944,487.89.  Special assessment, $300.

12             Based on a total offense level of 32 and a

13    criminal history category of one provides for a guideline range

14    of 121 to 151 months, supervised release term of two to three

10:02  15    years, fine, 17,500 to $750,000, restitution of $9,944.487.89,

16    special assessment, $300.

17             MR. SUNDE:  Your Honor, if I may, the money laundering

18    is a 10-year money laundering statute, not a 20.

19             THE COURT:  Not 20?  Not more than 10.  You are right.

10:03  20    It is not more than 10.  Where did I get not more than 20?

21    Count 3, you are right.  I'm sorry.  Count 3 is not more than

22    10 years.

23             MR. SUNDE:  Because of that, the effective guideline

24    range would become 120 months.

10:03  25             THE COURT:  You're right.

10:03  1    *(Off-the-record discussion held with the probation officer*
       2    *and the Court)*

       3          *THE COURT:*  The guideline range is correct.  We have
       4    more than one count so it can be consecutive counts.

10:04  5          *MR. SUNDE:*  Your Honor, I would invite the Court to
       6    reconsider its overruling of our objection to the use of
       7    sophisticated means.  The Court was under the impression that
       8    this was a structuring money laundering charge rather than a
       9    spending money laundering charge.

10:04  10         *THE COURT:*  No, I wasn't.  That wasn't the basis upon
       11   which I determined that it was a sophisticated means.  It is
       12   the number of other DME providers.  It's all over the country.
       13   It didn't have anything to do with that.  Trust me on that one.
       14   The only mistake was in my sentencing recommendation sheet.
10:05  15   She listed 20 years.  Clearly on the front of my presentence
       16   investigation report, it listed it as a 10-year imprisonment
       17   and the right money laundering charge.  It was just a mistake
       18   listed on my sentencing recommendation sheet.

       19         All right.  The United States has filed a motion
10:05  20   for downward departure and lists a number of factors for the
       21   Court to consider.

       22         Mr. Sunde, you said there is something else
       23   referenced in the memorandum that you just filed?

       24         *MR. SUNDE:*  Well, it's just -- general reference is
10:05  25   made to the ongoing nature of it, Your Honor.  I'm also --

10:05    1           *THE COURT:*  Where specifically?  I'm sorry.

2           *MR. SUNDE:*  Sure.  Bear with me just a moment.

3           *THE COURT:*  Take your time.

4     *(Pause)*

10:06    5           *MR. SUNDE:*  It's in the third section that

6 references --

7           *THE COURT:*  There is no page number.  Section III?

8           *MR. SUNDE:*  Yes, Your Honor, in that first paragraph.

9           *THE COURT:*  I already knew that.

10:06   10           *MR. SUNDE:*  I also have a letter dated January 24th

11 from the Eastern District of Texas which I would like to

12 supplement.  We just received that.

13           *THE COURT:*  Didn't I already get that?

14           *MR. SUNDE:*  No, Your Honor.  This is an additional

10:07   15 letter.

16           *THE COURT:*  I thought I had --

17           *MR. SUNDE:*  There is a letter from the Eastern --

18 well, there are two letters from the Eastern District.

19           *THE COURT:*  That's what I thought.  I thought I had

10:07   20 already gotten letters from the Eastern District already.  This

21 is just another letter?

22           *MR. SUNDE:*  That is -- the Court may recall that we

23 had to continue this two weeks ago as a consequence of

24 something that was going on.

10:07   25           *THE COURT:*  Somehow I knew this already.  How did I

10:07   1    know this already?  I knew that this had occurred.

2          MR. SUNDE:  It was probably from the motion that we

3    filed for continuance.

4          THE COURT:  Right.  Right.  Right.  Somehow or another

10:07   5    I already had this information about what happened.  I guess it

6    was because he was just there last week, so that is just an

7    additional letter.  Then the rest of it -- I guess I already

8    knew about the testimony.

9          Help me out on this issue.  I guess I'm sort of

10:08  10    at a loss on the issue, Mr. Balboni.  You've got cooperation,

11    but then in your motion, even in your motion, your 5K, you

12    bring to the Court's attention that I have got a forfeiture

13    count here and a proposed forfeiture order, but you indicate to

14    the Court that the defendant has not paid any of the seven and

10:09  15    a half million dollars that he got in this from fraudulent

16    proceeds.

17          MR. BALBONI:  That's correct.

18          THE COURT:  Is that part of the whole deal?  Is the

19    forfeiture still a part of this case?  Or is he just going to

10:09  20    get to keep the seven and a half million dollars?

21          MR. BALBONI:  Oh, no, no.  The forfeiture is still

22    part of the case.  The reason the government's recommendation

23    for the 5K is not as generous, if you will, as it might

24    otherwise be is that for the mere fact that Mr. Odelugo

10:09  25    received somewhere in the neighborhood of seven and a half

10:09    1    million dollars from the fraud, and he has known since the

         2    beginning that his cooperation included the return of that

         3    money.

         4            THE COURT:  Right.  So what is the status of that

10:09    5    then, Mr. Sunde?  Is he going to just --

         6            MR. SUNDE:  Well, Your Honor, I would take issue with

         7    Mr. Balboni's assertion that he has known from the beginning

         8    that his cooperation or -- this is --

         9            THE COURT:  He thinks he gets to keep the money?

10:10   10            MR. SUNDE:  Of course not, Your Honor.  No.  In fact,

        11    he has already -- in the preliminary order of forfeiture, there

        12    is one piece of property.  We have offered virtually everything

        13    he owns, including his assets in Nigeria, to the government.

        14    It is not a question of him keeping the money, Judge.  It is a

10:10   15    question of whether or not the plea agreement contemplated

        16    fully paying back the restitution or the forfeiture to be part

        17    of the government's assessment of whether or not he cooperated.

        18            Mr. Balboni very candidly tells us that in April

        19    of last year it was made known to Mr. Odelugo that he would

10:10   20    have to be paying back the government in order to get full

        21    credit for his cooperation.  That's almost nine months after

        22    the entry of the plea agreement, the only written agreement in

        23    this case, which spells out what the cooperation is.

        24            This is not some attempt on Mr. Odelugo's part to

10:11   25    avoid paying back the government.  He wants to do everything he

10:11   1    can do to pay back the government and so we have -- we came to

        2    an issue --

        3              THE COURT:  But I'm sentencing him today.

        4         MR. SUNDE:  You are, Judge.

10:11   5              THE COURT:  So far I have got, like, no part of the

        6    seven and a half million dollars has been paid back.  What's up

        7    with that?

        8         MR. SUNDE:  His property has been -- I guess it is in

        9    the process of being seized.  The motion has been filed and the

10:11  10    order, I guess, will be signed by the Court.  These are

       11    properties that he's had here in Harris County and in Fort Bend

       12    County.

       13              THE COURT:  Where is the money?  Where is the money?

       14    Hello, I'm talking to you.  Where is the money?

10:12  15              THE DEFENDANT:  Every money I have left I have

       16    already -- I wanted to give everything to the government.

       17              THE COURT:  I'm sorry.  I can't understand you.  Say

       18    it one more time.

       19              THE DEFENDANT:  I said every money I have --

10:12  20              THE COURT:  Every one?

       21              THE DEFENDANT:  Everything I own, I have told my

       22    lawyer I want to turn it in to the government.

       23         MR. SUNDE:  Your Honor --

       24              THE COURT:  Including the money?

10:12  25              THE DEFENDANT:  Everything I own.

10:12   1        *THE COURT:*   I'm sorry.  I can't hear both of you at

2    the same time.  What?

3             *THE DEFENDANT:*   Everything I own, Your Honor.

4             *THE COURT:*   Where is it?  How come you haven't done

10:12   5    it?

6             *THE DEFENDANT:*   The property is up for sale and

7    everything is taking time to close.  That's the point.

8             *THE COURT:*   So you are saying you don't have any of

9    the cash?

10:12  10             *THE DEFENDANT:*   I have some money left for the

11   government, about 12,240.

12             *THE COURT:*   12,000?

13             *THE DEFENDANT:*   $240.

14             *MR. SUNDE:*   That money, Your Honor, at the present

10:13  15   time is being held by the state in a -- I'm not sure what their

16   precise position is at the moment, but I believe it is --

17             *THE COURT:*   A companion case?

18             *MR. BALBONI:*   No.  It's not a companion case.  It's an

19   ambulance case.

10:13  20             *THE COURT:*   Oh, a completely different case?

21             *MR. BALBONI:*   Completely different case and so the

22   offer is if they can convince the state to give up the 240,000,

23   then they would give that to the federal government.

24             *THE COURT:*   Is that the one that's pending in the

10:13  25   248th?

10:13   1        *MR. BALBONI:*  No.  The 248th is the --

        2        *THE COURT:*  Isn't that the same as this?

        3        *MR. BALBONI:*  He is also a defendant in that case.

        4   That case involves more diapers.

10:13   5        *THE COURT:*  Wheelchairs?

        6        *MR. BALBONI:*  Yes.  And in that case, the defendant

        7   provided to the Court a photocopy of the $600,000 check at one

        8   point during the proceedings.

        9        *MR. SUNDE:*  That is incorrect, Your Honor.  There was

10:13   10  not a $600,000 photocopied check presented.  I don't know where

        11  Mr. Balboni gets that information, but that has never happened.

        12       *THE COURT:*  Whatever.  So that is not -- I thought

        13  that those were the same charges as this.  That is a completely

        14  different case?  That is not the same charges as this case?

10:14   15       *MR. BALBONI:*  It is not the same charges, no.

        16       *THE COURT:*  So that is just pending so that is --

        17  whatever, that is neither here nor there.

        18       *MR. SUNDE:*  Your Honor, if I may, back in September,

        19  we had a meeting in our office because Mr. Balboni recognized

10:14   20  that of these moneys that came to Mr. Odelugo, some of these

        21  moneys were spent actually buying the equipment, paying

        22  expenses, paying marketers, paying all the various and sundry

        23  expenses that come along with this.  Special Agent Martin

        24  prepared a report which was handed to me.  This was I think

10:14   25  about five days before a sentencing date at that time where we

10:15   1   requested a continuance to examine the report.  We had a

2   meeting in the office.

3               Pursuant to this report, the government was

4   assessing in the report that the actual amount of money was

10:15   5   3.7 million.  I think it was 3.7 million that was not dealing

6   with expenses.

7               THE COURT:  Was not what?

8               MR. SUNDE:  Of the seven-point -- of the roughly seven

9   and a half million that went to his accounts in this case,

10:15   10  approximately half of that, according to Special Agent Martin,

11  was spent on expenses.

12              THE COURT:  I see it.  He had all the income and then

13  cost of goods was at least half.

14              MR. SUNDE:  All that stuff, Your Honor, yes.  In

10:15   15  looking over the comments of the rough cost estimates, we

16  noticed that Special Agent Martin had used certain estimates in

17  some places.  In other places, he had just flatout guessed and

18  we felt it was important to sit down with the government to

19  discuss this issue further and we did, at which time -- at

10:16   20  which time Mr. Balboni said that Mr. Odelugo would owe the

21  government $2 million in order to get the consideration that

22  Mr. Balboni was prepared to give him under the 5K1.1 motion for

23  substantial assistance.  It is not to say that Mr. Odelugo only

24  owed the government $2 million.  It is not to say that that was

10:16   25  an exact figure of which the government was agreeing to in any

way, shape or form.

The amount owed by Mr. Odelugo has been established since the date of the plea agreement in this case. There is no debate about what is owed.  The debate was what was he capable of actually paying right now.  And as Mr. Odelugo has advised the Court and as I have advised the Court in our sentencing memorandum, he has agreed to give the government everything he owns.  He executed a power of attorney to his sister last year, some months ago, I should say, which was last year, to begin liquidating whatever assets he has got over in Nigeria.  Everything he owns here we have stated in writing to the government that we are prepared to give them.  And so the question was:  What did he have?  What was he able to pay?  I think with the roughly 980,000 over in Nigeria in assets and then moneys that were spent acquiring properties here, I don't know what the exact number comes out to but it's substantially more than a million dollars.

THE COURT:  You mean in actual real property that was purchased?

MR. SUNDE:  Real property, equipment, vehicles, things like this, some of which is in Nigeria, some of which is here.

During the course of this discussion in September, Mr. Balboni mentioned that if Mr. Odelugo had the receipts for certain items, those could legitimately be deducted from the amounts owed.

10:18    1          THE COURT:  Isn't that what the sheet is?  It looks
         2    like the cost of equipment.
         3          MR. SUNDE:  But there are certain items for which
         4    there is a zero entry for which there were costs.  Those
10:19    5    receipts, which we wish we had -- we wish we had those
         6    receipts.  Those receipts are no longer available to
         7    Mr. Odelugo because at some point in 2010, in the late spring
         8    or in the summer of 2010, a warehouse, a storage facility --
         9    not a warehouse, a storage facility that Mr. Odelugo was
10:19   10    renting, the lease lapsed on it and those records no longer are
        11    available to him.
        12          THE COURT:  So he didn't pay the storage bills and
        13    they took his stuff and threw it away?
        14          MR. SUNDE:  Yes, Your Honor.  Those bills are bills
10:19   15    that would have helped Mr. Odelugo present to the government
        16    evidence of additional expenses that he had.  We wish we had
        17    those bills.
        18          MR. BALBONI:  So do we, Your Honor.  As a matter of
        19    fact, it was part of his cooperation and agreement in the plea
10:19   20    agreement to turn over all relevant materials to the United
        21    States for purposes of cooperation, forfeiture, restitution.
        22          THE COURT:  Are those the things you are alluding to
        23    that he allowed to be destroyed?
        24          MR. BALBONI:  Yes, Your Honor, and we found out about
10:20   25    that in the September 27th meeting when Mr. Odelugo and

10:20   1   Mr. Sunde were questioning the good faith effort put together

2   by Agent Martin.  Had Mr. Odelugo provided what he claims was

3   in that storage unit, Agent Martin would not have had to go

4   through this exercise, and we could have just looked at what

10:20   5   was there.

6              *THE COURT:*  Let me stop you guys for just a second

7   here because obviously this discussion is occurring in the

8   context of the motion for downward departure, and the Court's

9   question about, you know, the government's concern with respect

10:20   10   to the payment of proceeds.  Even setting all of that aside,

11   the motion for downward departure essentially asks for a full

12   level downward departure, almost 40 percent off of the sentence

13   that he would have otherwise received, which, you know, from

14   the Court's experience is about the norm for almost any motion

10:21   15   for downward departure or actually on the generous side in

16   terms of what motions for downward departure usually look like.

17   So aside from the government's, I guess, quibble of the full

18   extent of his cooperation, it still doesn't look like they

19   skimped in any way on the motion for downward departure which

10:21   20   to me at least recognizes that he has provided substantial

21   assistance in some other ways.  So I was just asking the

22   question because, you know, clearly at the end of the day, I

23   get to take all of that into consideration in determining what

24   an appropriate sentence is, and the Court takes the motion into

10:21   25   consideration in terms of determining a sentence, and so I was

```
10:22    1    just seeking some initial clarification.

         2            I'm not taking issue with the extent of the

         3    government's downward departure because I think it actually

         4    reflects more or less an average departure or -- on the high

10:22    5    end of what departures generally look like, at least four

         6    levels in this particular instance.  It is basically like a

         7    five-level departure, which is pretty high.

         8            In any event, the government's motion for

         9    downward departure is granted and the Court will take it into

10:22   10    consideration in determining what it believes to be the

        11    appropriate sentence in this case.

        12            Esthela, give Mr. Balboni back his book.

        13            All right, Mr. Sunde, anything, did you want to

        14    say anything on behalf of your client, please?

10:22   15            MR. SUNDE:  Your Honor, we do have a request for a

        16    variance which I would like to take up with the Court at this

        17    time.

        18            THE COURT:  I don't have to do a variance.  I'm going

        19    to grant a 5K, and I'm not even in the guidelines anymore if I

10:23   20    have a 5K.

        21            MR. SUNDE:  Well, there are issues that are, I think,

        22    not part of his cooperation agreement that we would ask the

        23    Court to take into consideration --

        24            THE COURT:  It wouldn't be a variance at this point in

10:23   25    time.  I'm going to sentence pursuant to 5K, which means I'm
```

10:23   1   not doing a guideline sentence per se.

2              *MR. SUNDE:*  Well, then I will make the following

3   argument, Your Honor.

4              *THE COURT:*  Okay.

10:23   5              *MR. SUNDE:*  Mr. Odelugo got arrested back in March of

6   2008.  He served seven months in custody on a case involving

7   DME fraud.

8              *THE COURT:*  You are talking about not this case,

9   something else?

10:23   10             *MR. SUNDE:*  That's the state case that I'm referring

11   to.

12             *THE COURT:*  Okay.  Okay.

13             *MR. SUNDE:*  And the overall nature of that criminal

14   activity is essentially the same as this criminal activity.

10:24   15             *THE COURT:*  Okay.

16             *MR. SUNDE:*  There are different items involved.

17             *THE COURT:*  Is that the one that's listed in my PSR as

18   pending?

19             *MR. SUNDE:*  It is, Your Honor.  It sure is.  But I

10:24   20   want to bring to the Court's attention the fact that he spent

21   seven months in custody in that case.  When he got out, he

22   hired me -- or he hired me about a week before he got out.  He

23   indicated to me that he wanted to cooperate at every level, and

24   he began that cooperation.  The cooperation has been

10:24   25   extraordinary in my opinion.  I know that the government has

10:24   1   asserted in its motion for downward departure that the -- he is

2   essentially at the top of the scheme and all he is doing is

3   cooperating against the guys that are lower than him, and

4   because of that, they are all pleading guilty.  And it tends to

10:25   5   minimize that cooperation, I think.

6          *THE COURT:*  Usually the people who cooperate are the

7   people that are at the top of the food chain.  That's the way

8   it is.  The people who are at the bottom can't cooperate

9   because they don't know anything.  It is always the people at

10:25   10   the top.  I don't know how that minimizes it.  It is what it

11   is.  The people at the top always know more.

12          *MR. SUNDE:*  I would point out that in the letters from

13   the Eastern District of Texas --

14          *THE COURT:*  The one you just gave me and the earlier

10:25   15   ones?

16          *MR. SUNDE:*  I have given you one, Your Honor, that I

17   just handed to you.  The other one is dated June 29, 2011.

18          *THE COURT:*  Right.  I got that.

19          *MR. SUNDE:*  In the statement by Alan Jackson, who is

10:25   20   the Criminal Chief up in the Tyler Division of the Eastern

21   District, he describes his cooperation and assistance as

22   substantial, but goes further and says:  "Not only has

23   assistance been significant and unusual but the information

24   provided has been truthful, complete and reliable as evidenced

10:26   25   by the paragraphs above.  His assistance has been extensive,

resulting in eight convictions to date and one indicted

fugitive."

　　　　　　The letter that I have given you is yet another

case beyond these, and it is not mentioned in the motion for

downward departure.

　　　　　　"His efforts to assist prosecutors and law

enforcement in our district have led to numerous convictions,

hundreds of thousands of dollars of court-ordered restitution

and ultimately a better and safer and more law-abiding

society."

　　　　　　The letter from Christopher Tortorice, which was

written at the request of an immigration attorney, but

describes his cooperation --

　　　　　　*THE COURT:*  I have all of these already.

　　　　　　*MR. SUNDE:*  Very good, Your Honor.

　　　　　　*THE COURT:*  Yeah.

　　　　　　*MR. SUNDE:*  Now, in addition to those things, which

fall squarely within the rubric of the cooperation agreement, I

got a call early last year from Special Agent Martin.  And in

that call, Special Agent Martin advised me that he had received

word from the OIG's office in HHS that they were looking for

somebody to come and testify in Congress about healthcare

fraud, somebody who had committed healthcare fraud.

　　　　　　*THE COURT:*  That is this deal, right?

　　　　　　*MR. SUNDE:*  That is the congressional testimony that

10:27   1    is included.

        2              *THE COURT:*  Right.

        3              *MR. SUNDE:*  So he went to Congress and he testified,

        4    and he was -- I think he made a significant contribution.  His

10:27   5    testimony -- portions of his testimony are included in a CD

        6    that is currently used to train HHS agents.  The general

        7    counsel of OIG came up to us during portions of the

        8    congressional testimony and thanked us for the very insightful

        9    and instructive suggestions that he provided on how the

10:28  10    government could stop this type of fraud in the future.

       11              His testimony was made public virtually

       12    immediately.  It went out over the Internet.  It went out over

       13    the press.  It went out on television.  It has continued to be

       14    the subject of reports, and as a consequence, he has received

10:28  15    threatening phone calls.  His vehicle has been vandalized.

       16    Mr. Odelugo is a guy who does not like to admit that he's

       17    afraid of anybody.  And he has stated to Mr. Balboni that he

       18    was not concerned about the threatening phone calls, but he has

       19    privately stated to me that he has been deeply concerned about

10:29  20    them.  People seem to come out from the woodwork in these sorts

       21    of situations.  Again, there has been a physical -- there has

       22    been physical retribution.  I asked him -- I said, "What

       23    happened to your vehicle?"  He said, "It got keyed."  I said,

       24    "It happens to everybody in the mall parking lot," until I went

10:29  25    to go look at it, and it was just horrendously vandalized.

10:30    1          Mr. Odelugo is going to end up being deported.

         2   He is going to go back to Nigeria to a place where this

         3   cooperation is well-known, where his congressional testimony is

         4   well-known.  And he is going to have to live in Nigeria looking

10:30    5   over his shoulder for the rest of his life.  I don't know of

         6   any single Nigerian who has ever come forward so publicly and

         7   commented so candidly and so directly on fraud within the

         8   Nigerian community and otherwise, because it is not just

         9   obviously people in the Nigerian community that commit this

10:30   10   type of fraud.  Because this doesn't fall squarely within the

        11   rubric of the cooperation, it was made plain to us that he

        12   didn't have to do this.  It was not mandatory.  It was not part

        13   of his cooperation, but if he wanted to take that extra step

        14   and contribute, the invitation was there.  They felt that he

10:31   15   would make a very fine witness and, in fact, he did.

        16          It's the type of stuff, as we mentioned in our

        17   sentencing memorandum, Your Honor, that I think that clearly

        18   speaks toward his rehabilitation.

        19          Over the past four years, I have spent so much

10:31   20   time with him, meetings outside of the office, in the office.

        21   He has been to my home.  We have had meetings with the agents.

        22   It is something that I have honestly never seen.  Of course, I

        23   have never been with a client up to Congress to testify.  I

        24   have never sat down and watched video clips of my client

10:31   25   testifying on television and on the Internet.

10:32    1                    The letter from Congressman Boustany, who is the

         2          Chairman of the Subcommittee for Oversight in the Ways and

         3          Means Committee -- he's in charge of this.  He is very

         4          appreciative of his efforts.  The testimony itself, which has

10:32    5          been included, provides very concrete steps which HHS, I would

         6          imagine, is employing to combat this type of fraud in the

         7          future.

         8                    There is over, I believe it is, $65 billion

         9          according to the FBI of healthcare fraud that goes on in this

10:32   10          country on an annual basis.

        11                    I understand and Mr. Odelugo understands

        12          profoundly that what he did was brave, that what he did was

        13          serious and that what he did made a significant dent into the

        14          taxpayers' coffers.  $27 million was billed for; $9 million was

10:33   15          actually paid out.  These are not small numbers.

        16                    Nevertheless, Your Honor, he has done everything

        17          he can possibly do.  He has gone far, far beyond what any

        18          defendant that I have ever seen has done in terms of actively

        19          coming forward, speaking to Congress, to the entire nation

10:33   20          about how to combat healthcare fraud.  Again, it is used to

        21          train new agents.  I think this speaks tremendously about

        22          Mr. Odelugo, and I would request -- it's the basis of our

        23          variance.

        24                    I understand that the Court is giving a

10:34   25          non-guideline sentence pursuant to his substantial assistance,

10:34   1   but this does not, again, fall within the rubric of that

        2   substantial assistance.  I believe that the Court would be more

        3   than justified, given his desire and willingness to repay the

        4   government with these assets, one of which is already named to

10:34   5   be seized, the others of which we are prepared to sign over

        6   tomorrow, in sentencing him to a sentence -- a noncustodial

        7   sentence of home confinement while he continues his

        8   cooperation.

        9           We would ask that, Your Honor, and I know that it

10:34  10   is a great deal to ask.

       11       *THE COURT:*  It sure is.  How do you think you get to a

       12   noncustodial sentence?  Seriously?  Really?

       13       *MR. SUNDE:*  He has stepped forward in a way that few

       14   have, Your Honor.  I am not sure that I can think of a single

10:35  15   case -- excuse me, Judge, I need some water.

       16       *(Pause)*

       17       *MR. SUNDE:*  Judge, if you look at the letter that

       18   comes from a young woman whose name is Anuli Ezumah, you read

       19   this letter and you find out that in 2001, Ike was in Nigeria.

10:36  20   He is driving along the highway and he happens upon an

       21   accident.  This young woman's father has been killed.  He is

       22   lying dead on the side of the road.  She is in terrible shape.

       23   He stops, as do others, but he is the one who renders aid.  He

       24   is the one who takes her to the hospital.  He is the one who,

10:36  25   when she comes to the United States, assists her in getting

10:36   1   established and continues to maintain his relationship with her

2   in part because she ended up marrying a friend of his.  But,

3   you know, Judge, folks will drive by all kinds of stuff.  I

4   drove by an accident myself several weeks ago.  I will be

10:36   5   candid with you, Judge, my initial reaction was not to stop.

6   My wife said, "Stop."  Ike stopped and he rendered aid.  He has

7   stopped committing healthcare fraud.  He has been running a

8   legitimate business, and he is rendering aid in the only way he

9   knows how, which is through cooperation and through his

10:37   10   congressional testimony.

11              It's not the ordinary case, Judge.  It's a case

12   that I think really cries out for a very, very substantial

13   reduction from the guidelines, and I believe that given the

14   unique set of facts in this case and the unique nature of the

10:37   15   steps that Ike has taken, it's warranted -- a noncustodial

16   sentence is warranted in this case.

17          THE COURT:  Mr. Odelugo, what would you like to say on

18   your own behalf, sir?

19          MR. SUNDE:  Do you want to say something?

10:38   20      (No response)

21          MR. SUNDE:  Your Honor, I would just like to read into

22   the record from Mr. Odelugo something that he has written.

23   These are words from a song that he sang in church when he was

24   a kid.  I don't know if the Court will recognize it, but he

10:38   25   writes:  "Good morning, Judge Gilmore.  It is the gift to be

10:38       1   simple.  It is the gift to be free.  It is the gift to come

            2   down where we ought to be.  And when we find ourselves in the

            3   place just right, it will be in the valley of love and delight.

            4           "When true simplicity is gained, to bow, to bend,

10:38       5   we shall not be ashamed.  To turn will be our delight until by

            6   turning, turning, we come around right.

            7           "These words were written by Elder Joseph over

            8   150 years ago.  Over the course of the last almost four years,

            9   I have, as Elder Joseph's words suggest, turned my life around.

10:39      10   I have dealt with the shame of my actions and the shame I have

           11   brought upon my family.  I have done all I can possibly do to

           12   correct my wrongs.  I have cooperated with the federal

           13   government to the best of my ability.  I have traveled to

           14   Washington to testify before Congress and make suggestions that

10:39      15   would help prevent future healthcare fraud.  I have extended to

           16   the government my future cooperation.  I have instructed my

           17   lawyer to offer the government all of my assets, both here and

           18   in Nigeria, to go toward the restitution in this case.  I

           19   simply do not know what else I can do.

10:39      20           "As a consequence of my cooperation, I have

           21   received threats and my property has been vandalized.  I knew

           22   that such things could occur when I made the decision to

           23   cooperate.  I am not complaining.  I have lost most of the

           24   people I used to call friends, as well, but this is probably a

10:40      25   good thing, as the circle of people I used to hang out with was

10:40    1   not a very good one.

         2               "Judge Gilmore, I would like to apologize to the

         3   people of the United States and to this Court for what I have

         4   done.  I would also like to apologize to Mr. Balboni and the

10:40    5   United States Government.

         6               "Finally, I would like to apologize to my mother,

         7   whom I love and admire dearly.

         8               "Thank you."

         9          THE COURT:  Okay.  Mr. Balboni, anything from the

10:40   10   United States, please?

        11          MR. BALBONI:  Yes, Your Honor.  Ike Odelugo is a

        12   master manipulator.

        13          THE COURT:  Pardon me?

        14          MR. BALBONI:  He is a master manipulator.  He has

10:40   15   walked away with somewhere -- given the generous cost of goods

        16   sold, somewhere in the neighborhood of three and a half million

        17   dollars.  He wrote checks to himself during the time from the

        18   proceeds of $3 million.  What he offers is a couple pieces of

        19   property here in Houston and some assets in Nigeria, which I

10:41   20   need to point out were not originally disclosed to probation.

        21   In the initial financial disclosure, all of the Nigerian assets

        22   remained hidden, if you will.  Together I think they total

        23   somewhere -- assuming the values as stated by the defendant,

        24   total somewhere in the neighborhood of $1.4 million perhaps.

10:41   25               The cooperation with respect to the

10:41   1   co-conspirators that he was engaged with, he was the

2   75 percent -- 70, 75 owner, if you would, of each of these

3   ongoing fraud schemes.  He cooperated against the 25,

4   30 percent owners.

10:42   5   With respect to the cooperation, ongoing

6   cooperation, he was apparently -- had an immigration lawyer,

7   without going through my office, which is the office through

8   which he is cooperating under this plea agreement, went

9   directly to the Special Assistant U.S. Attorney in both Tyler

10:42   10   and, I think, in Beaumont with the idea that he needed an

11   S-visa because he knows his status here is not legal, so he

12   initiated the S-visa process, which, of course, as the Court is

13   aware, is a process where the United States needs a witness who

14   doesn't have proper status to remain in the country for some

10:43   15   reason.

16   The letter from -- in the defendant's sentencing

17   memorandum, the one that is "To Whom It May Concern," it's

18   about five or six pages from the back, the one dated July 13,

19   2011, the AUSA at the bottom, Christopher Tortorice -- I had

10:43   20   never seen this letter prior to it appearing in Mr. Sunde's

21   filing.  And the third paragraph says, "The admission of

22   Mr. Odelugo as an S-visa nonimmigrant is essential and in the

23   national interest."

24   That language, according to Mr. Tortorice, came

10:44   25   from the immigration lawyer who knew what the United States

1    needed to represent to start the process.

2           Unfortunately, for this backdoor attempt to get

3    an S-visa out of the Eastern District when there is a much more

4    detailed application that needs to be filed and it needs to be

5    filed by the United States, when that was presented to the

6    Eastern District fortunately Mr. Jackson, the Criminal Chief

7    got involved and realized that if such a visa is necessary,

8    that's a matter that should go through me because Mr. Odelugo

9    is a defendant in my case.

10          THE COURT:  And he is cooperating in the Eastern

11   District?

12          MR. BALBONI:  Yes, Your Honor.  He cooperated here.

13   He cooperated in the Eastern District.

14          THE COURT:  But it has to be where the prosecution is?

15          MR. BALBONI:  Right, Your Honor.  In other words,

16   everything he is doing in cooperation is reported then back

17   through me and becomes the basis of any 5K motion by the

18   government.  It never was brought to my attention that this

19   S-visa process was ongoing and I may not have known about it

20   until this filing, had the Criminal Chief in the Eastern

21   District not stepped in and realized that it should be here in

22   the Southern District.

23          I think I put in my motion that I filed, he

24   certainly deserves some cooperation credit for the 12 or 13

25   convictions that were obtained because his co-conspirators knew

10:45   1    that he knew everything that went on for each of them.

2              THE COURT:  Is that the basis upon which you made the

3    fairly significant request for a downward departure?

4              MR. BALBONI:  Yes, Your Honor, and also I don't

10:45   5    believe Mr. Odelugo or Mr. Sunde was ever told that his

6    testimony before Congress would not be considered for his

7    cooperation.

8              THE COURT:  What do you mean?  I don't understand

9    that.

10:46   10             MR. BALBONI:  Part of Mr. Sunde's argument was that he

11   should get even greater departure or variance because his

12   testimony in front of Congress was not contemplated as

13   cooperation in the original agreement, so, therefore, he should

14   get an additional credit for that.  And I just want to say that

10:46   15   when the agreement, if you will, was struck allowing

16   Mr. Odelugo to go to Washington to testify, that that was -- it

17   was never said that that was not going to be part of the

18   calculation, if you will, as to where his cooperation would

19   land him, if you will, with respect to the indictment.

10:46   20             MR. SUNDE:  Your Honor, may I briefly state something?

21             THE COURT:  Were you finished?

22             MR. BALBONI:  Yes, I believe I am, Your Honor.

23             THE COURT:  That's fine.  Mr. Sunde?

24             MR. SUNDE:  Judge, Mr. Balboni -- he may not remember,

10:47   25   but he did have a conversation with me in which he stated that

10:47   1   Mr. Odelugo could go to Congress if he wanted to, but it was

2   not going to be part of his cooperation.  It was not mandatory.

3   It was not part of what he was obliged to do in terms of his

4   cooperation.

10:47   5       *(Off the record discussion between the Court and the*

6   *probation officer)*

7       *THE COURT:*  The Court will state the sentence at this

8   time.  The lawyers will have a final opportunity to make any

9   objections before the sentence is imposed.

10:52   10       It is the judgment of this Court that the

11   defendant, Aghaegbuna Odelugo, is hereby committed to the

12   custody of the Bureau of Prisons to be imprisoned for a term of

13   60 months as to Count 1 and 12 months as to Counts 2 and 3,

14   such terms to run concurrently to each other and consecutively

10:52   15   to the term imposed in Count 1, for a total term of

16   imprisonment of 72 months.

17       The defendant is before this Court for sentencing

18   as a result of his conviction for three counts of conspiracy,

19   healthcare fraud and money laundering.  This is the defendant's

10:53   20   first conviction in the criminal justice system.  The defendant

21   is a 38-year-old citizen of Nigeria.  He came to the United

22   States in 1998 on a visa and set up agreements with 14 DME,

23   durable medical equipment, company owners who agreed to provide

24   their Medicare provider numbers to split the profits of a

10:53   25   scheme to defraud Medicare and Medicaid and divide the

accounting of approximately 75 percent of the profits to the defendant and 25 percent or thereabouts to the providers.

He obtained beneficiary information by paying recruiters, creating paperwork and patient files to give the appearance of a valid claim.  He electronically filed the claims submitted to Medicaid and collected the majority of the reimbursements.  In an attempt to conceal this controlled ownership of the funds, the defendant utilized blank, signed checks from company owners entering his own name and amounts and made cash deposits and wire transfers.  He established his own company, Ciba Corporation, to receive payments from the DME companies to appear as a wholesaler.  The entire scheme generated bill-outs of $28,372,739.15.  The defendant is being held responsible for $9,944,487.89 in restitution, which is the total amount actually paid by Medicare and Medicaid.

The guideline range based on the large amount of the fraud was 121 to 151 months.  In this case, however, the defendant has provided substantial assistance and the government has filed a 5K motion.  The Court departs downward pursuant to the 5K motion giving the defendant credit for his substantial assistance in assisting with other prosecutions as well as his efforts to provide information in his testimony before Congress.

The Court believes that given his level of cooperation a sentence of 72 months is sufficient without being

greater than necessary and that a custodial sentence in this
case is necessary for deterrence to promote respect for the
law, and it takes into consideration other similar conduct and
otherwise meets the sentencing purposes of 18 United States
Code, Section 3553(a).

Upon release from imprisonment, the defendant
shall be placed on supervised release for a term of three years
as to Counts 1, 2 and 3, all such terms to run concurrently,
for a total term of supervision of three years.

Although it is likely the defendant will be
immediately deported upon his release of incarceration, a term
of supervised release is imposed to deter the defendant from
reentering the United States illegally.

Within 72 hours of release from the custody of
the Bureau of Prisons, the defendant shall report in person to
the probation office in the district to which the defendant is
released.

While on supervised release, the defendant shall
not commit another federal, state or local crime, shall comply
with the standard conditions that have been adopted by this
Court and any mandatory conditions required by law, including
the following additional conditions:  The defendant shall not
possess a firearm, ammunition, destructive device or any other
dangerous weapon.  The defendant shall cooperate in the
collection of a DNA sample, if such is authorized.

10:56   1          The defendant is required to provide the

2   probation officer access to any requested financial

3   information.  The fine and restitution is imposed.  The

4   defendant is prohibited from incurring new credit charges or

10:57   5   opening additional lines of credit without the approval of the

6   probation office.

7          The defendant is prohibited from possessing a

8   credit access device, such as a credit card, unless first

9   authorized by the probation officer.

10:57   10          It is further ordered that the defendant shall

11   pay to the United States a special assessment of $100 as to

12   each of Counts 1, 2 and 3 for a total of $300.

13          The Court finds that the defendant does not have

14   the ability to pay a fine within the guideline range and the

10:57   15   fine is waived in this case.

16          It is further ordered that the defendant is to

17   pay restitution in the amount of $9,944,487.89.  The amount of

18   restitution to Medicare is $9,933,354.27 and the amount of

19   restitution to Medicaid is $11,133.62.

10:57   20          It is further ordered that the defendant is

21   jointly and severally liable on the Medicare amount owed as

22   follows:  With Mento Kaluanya in the amount of $338,905.97 and

23   with Basil Kalu and Darnell Denese Willis in the amount of

24   $844,165.66.

10:58   25          The defendant's restitution obligation shall not

10:58      1    be affected by any restitution payments that have been made by

           2    any of the other defendants in this case except that no further

           3    payments shall be required after the sum of the amounts paid by

           4    all defendants has fully covered the compensable losses.

10:58      5            The defendant shall make a lump sum payment of

           6    $300, due and payable immediately.  The balance of these

           7    criminal monetary penalties are due in no less than 50 percent

           8    of any wages earned while in prison and in accordance with the

           9    Bureau of Prisons Inmate Financial Responsibility Program.

10:59     10            Any remaining balance after release from

          11    imprisonment shall be due in equal monthly installments of no

          12    less than $1,000 per month, to commence 60 days after release

          13    from imprisonment to a term of supervision.  Payment to be made

          14    through the United States District Clerk's office of all

10:59     15    monetary penalties.

          16            Mr. Balboni, do you know of any reason why the

          17    sentence should not be imposed as stated?

          18        *MR. BALBONI:*  Just that we need to add, Your Honor,

          19    the United States has filed a motion for a preliminary order of

10:59     20    forfeiture.

          21        *THE COURT:*  I will deal with that in a minute.  Let me

          22    just deal with the sentence.

          23        *MR. BALBONI:*  As long as ultimately you make it part

          24    of the sentence, I have no reason to believe the sentence

10:59     25    cannot be imposed as stated.

10:59   1           THE COURT:  Mr. Sunde, do you know of any reason why

2      the sentence should not be imposed as stated?

3              MR. SUNDE:  I do not, Your Honor.

4              THE COURT:  All right.  Then the sentence is imposed

10:59   5      as stated.

6              Mr. Odelugo, you can appeal your conviction if

7      you believe that your guilty plea was somehow unlawful or

8      involuntary or if you think that there was some other

9      fundamental defect in the proceedings that was not waived by

11:00  10      you.  However, the defendant can waive those rights as part of

11      a plea agreement, and in this case you waived your right to

12      appeal.  Those waivers are generally enforceable, but you if

13      you think your waiver is unenforceable for some reason, you can

14      present that theory to the Court of Appeals.

11:00  15              With few exceptions, any notice of appeal must be

16      filed within 15 days of the date the judgment is entered in

17      this case.

18              Do you understand, me, sir?

19       (The defendant conferred with his attorney)

11:00  20              THE DEFENDANT:  Yes, ma'am.

21              THE COURT:  The United States has filed a preliminary

22      order of forfeiture.  Why would it be a preliminary order?  Why

23      wouldn't this be a final order at this point in time?

24              MR. BALBONI:  I believe, Your Honor, because the --

11:01  25      for one reason, there is real estate involved.

1   *THE COURT:*  That's why it still has to be listed as

2   preliminary?

3        *MR. BALBONI:*  Right.  Eventually, once that is done

4   and third party claims are --

5        *MS. HADEN:*  It would be final as to the defendant,

6   Your Honor, but as a third party they would have the ability --

7   we need to notice the third parties once the preliminary order

8   and final order --

9        *THE COURT:*  I have no idea who you are.  You can't

10  just talk on the record without us knowing who you are.

11       *MS. HADEN:*  I'm sorry, Your Honor.  Katherine Haden

12  with the United States Attorney's Office.

13       *THE COURT:*  Say it again, please.

14       *MS. HADEN:*  Katherine Haden with the United States

15  Attorney's Office.  I have been working with Al on forfeiture.

16  I apologize for not introducing myself.

17       *THE COURT:*  Okay.  And so what were you saying,

18  please?

19       *MS. HADEN:*  The order of forfeiture, the preliminary

20  order of forfeiture would become final as to the defendant

21  today.  We would then publish a notice for any potential

22  interested third parties and then it would be final as to

23  everyone.

24       *THE COURT:*  Because there is all of that real estate

25  and stuff?

11:02   1        *MS. HADEN:*  Yes, Your Honor.

2         *THE COURT:*  Then the Court is signing the preliminary

3   order of forfeiture today in accordance with the plea

4   agreement.  So the defendant is on bond of $100,000.  It looks

11:02   5   like an unsecured bond.

6         Does the United States have any objection to the

7   defendant remaining on bond?

8         *MR. BALBONI:*  Yes, Your Honor.  The United States

9   would ask that his bond be revoked and he be taken into custody

11:02   10   immediately.

11         *MR. SUNDE:*  We would request that he be allowed to

12   remain on bond, Your Honor, and that he self surrender.  He has

13   been out for almost four years and has not posed any risk of

14   any flight or not committed any crimes against society since he

11:02   15   has been out.  I think there is no question but that he will be

16   self surrendering per the Court's instruction, so we request

17   that he be allowed to remain out.

18         *MR. BALBONI:*  One thing that has changed, Your Honor,

19   is that now he knows he has a seven-year sentence to serve and

11:03   20   previously --

21         *MR. SUNDE:*  It is actually six, Your Honor.

22         *THE COURT:*  It is six.

23         *MR. BALBONI:*  I'm sorry.  It is six.  Seven was what I

24   asked for.

11:03   25         *THE COURT:*  You can't multiply or divide or something.

11:03   1      *MR. SUNDE:*  Judge, we have known for quite sometime

2      that there was a very real probability he would be serving time

3      in this case.  It is -- again, what he has demonstrated over

4      the last four years is clear commitment to be responsible in

11:03   5      this case in terms of showing up every time he has been

6      requested to show up.

7          *THE COURT:*  Given the nature of the sentence and

8      imposition of the sentence and the discussion here today, the

9      Court believes that the bond should be revoked and that the

11:03   10      defendant should be taken into custody immediately.  Bond is

11      revoked.

12              Marshals, take the defendant into custody,

13      please.

14          *(Off the record discussion held)*

11:04   15          *THE COURT:*  Thank you.  You are excused.

16          *(Proceedings concluded at 11:04 a.m.)*

17                              * * * *

             I certify that the foregoing is a correct transcript from
18      the record of proceedings in the above-entitled cause.

19      Date: November 25, 2012

20

                        /s/ *Mayra Malone*
21                      ---------------------------------------
                        Mayra Malone, CSR, RMR, CRR
22                      Official Court Reporter

23

24

25